AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Room 206,Homewood Suites by Hilton, 1520 Sunport<br>Place Southeast, Albuquerque, New Mexico and a 2020<br>GMC Yukon, AZ tag Z0A04B | )<br>)<br>)<br>)<br>)<br>) |

**FILED**
United States District Court
Albuquerque, New Mexico
Mitchell R. Elfers
Clerk of Court

Case No.  **22mr1728**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See attachment A

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and<br>846; 18 U.S.C. §§ 922(g)(1)<br>and 924, an18 U.S.C. § 924(c) | Distribution and possession with intent to distribute controlled substances and<br>conspiracy thereto; Possession of a firearm and ammunition by a convicted felon;<br>Possession of a firearm in furtherance of a drug trafficking crime |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jordan Spaeth, FBI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_ electronically submitted and telephonically sworn _ *(specify reliable electronic means)*.

Date: November 18, 2022

_____
*Judge's signature*

City and state:  Albuquerque, New Mexico

Laura Fashing, United States Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

### INTRODUCTION

1.      I, Jordan Spaeth, Special Agent of the Federal Bureau of Investigation ("FBI"), being first duly sworn, make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the hotel room of Gerardo OLAIZ, ("OLAIZ"), room 206 at the Homewood Suites by Hilton Albuquerque Airport, 1520 Sunport Place Southeast, Albuquerque, New Mexico and OLAIZ's vehicle, a 2020 GMC Yukon, with Arizona tag Z0A04B (Subject Premises). I am requesting a warrant to search the Subject Premises for the items listed in Attachment B, which has been attached hereto and incorporated herein by reference.

### PURPOSE OF THE AFFIDAVIT

2.      Based on the facts and information contained herein, I believe the Subject Premises contains evidence, fruits, and instrumentalities of violations of:

      a. 21 U.S.C. §§ 841(a)(1) and 846, that being distribution and possession with intent to distribute controlled substances and conspiracy thereto;

      b. 18 U.S.C. §§ 922(g)(1) and 924, that being possession of a firearm and ammunition by a convicted felon; and

      c. 18 U.S.C. § 924(c), that being possession of a firearm in furtherance of a drug trafficking crime (hereinafter the "target offenses").

3.      This affidavit does not set forth all of my knowledge or summarize all of the investigative efforts in this matter; however, the affidavit sets forth only the facts that support probable cause to search the Subject Premises as relevant background information. All figures, times, and calculations set forth herein are approximate.

### AFFIANT'S RELEVANT TRAINING AND EXPERIENCE

4.      I am a Special Agent with the FBI and have been a sworn law enforcement officer

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

for approximately 14 years, serving as a police officer and FBI Special Agent. I have been with the FBI since 2018 and am currently assigned to the Violent Gang Task Force ("VGTF"). As a member of the VGTF my primary responsibility is to investigate criminal enterprises involving violent repeat offenders and gang members who participate in murder, narcotics violations, firearms violations, human trafficking, robberies, and other violations of federal law. Prior to my current assignment I was assigned to the Violent Crime Task Force and also worked violent felony crimes which were committed on the multiple Indian Reservations/Pueblos surrounding Albuquerque.

5.      My investigative training and experience includes, but is not limited to, interviewing subjects, targets, and witnesses, writing affidavits for, and executing search and arrest warrants, collecting evidence, conducting surveillance, and analyzing public records. Over the course of my career, I have arrested hundreds of persons for offenses relating to armed robberies, firearm violations, bank robberies, illegal narcotics, and other criminal conduct. I have also been responsible for serving subpoenas and supervising cooperating sources, as well as analyzing phone records.

6.      Through my training and experience, I am familiar with the methods and means used by individuals, drug trafficking organizations ("DTO"s), and gang/criminal enterprises to purchase, transport, store, and distribute controlled substances and firearms. I am also familiar with how those individuals and organizations hide the substantial profits generated from their criminal activities. I am aware that those individuals conceal firearms on their person as well as evidence of their drug trafficking, to include illegal narcotics and large amounts of United States Currency.

7.      I know that firearms are tools of the trade and instrumentalities of the crime of drug trafficking, particularly in instances involving subjects who have committed prior violent crimes and/or firearms violations. It has been my experience that criminals who illegally possess firearms

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

often do not part with such firearms, as it may be difficult for criminals to acquire them. I know that gang members often possess firearms on or near their person, in their vehicles and residences.  I know that individuals who are prohibited from possessing firearms know they are not allowed to possess those firearms, therefore they will secrete those firearms within their vehicles, outbuildings, or residences.

8.      It has been my experience that individuals engaged in drug trafficking and gang activities possess firearms to facilitate their illegal activities. I am aware that members of DTO's and gang members often possess firearms to protect the often substantial profits from selling narcotics. Also, I have learned that gang members possess firearms to threaten other individuals and assault other gang members in an effort to establish their gang as powerful and successful.

9.      Based upon my training, experience, and participation in gang/criminal enterprises and DTO's, I am aware individuals engaged in drug trafficking maintain documents, letters and records relating to their illegal activities for long periods of time. This documentary evidence is usually secreted in their hotel room, place of residence, or the residences of family members, friends, or associates, in their business locations, or in stash houses. This documentary evidence includes telephone numbers, address books, travel receipts, notes referencing aliases or coded names, false identification, money order receipts, money orders, money remittance receipts, pre-paid money cards such as, MoneyPak, Wal-Mart, Green Dot, or other debit cards, bulk U.S currency, money collection logs, such as "tally" sheets, drug load sheets, shipping/mailing receipts, detention facility inmate number lists or addresses for inmates or detention facilities.

10.     I know that members and associates of gang/criminal enterprises and DTOs often make substantial profits from their drug trafficking ventures. Often times, individuals engaged in drug trafficking do not deposit their profits into the bank so as to avoid detention by law

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

enforcement. I know that individuals engaged in drug trafficking often keep large amounts of United States Currency at their residence. Along with United States Currency, I know that members engaged in drug trafficking may purchase expensive jewelry with their drug proceeds to avoid detection. Therefore, I know that members engaged in drug trafficking may have expensive jewelry which is the result of their drug trafficking operations.

11.     Individuals engaged in drug trafficking are weary of law enforcement surveillance as well as other criminals who would steal their drugs or drug trafficking proceeds. Therefore, I know individuals engaged in drug trafficking to use surreptitious and overt video and audio recording devices at their hotel room, residences, store video and audio recordings in hard drives or other electronic storage devices and have real-time access to video and audio surveillance via applications on their smartphones.

12.     I know that members and associates of gang/criminal enterprises and DTOs have access to numerous cellular phones, often at the same time, in an effort to avoid law enforcement monitoring. I have observed gang members, who are involved in drug trafficking, routinely use pre-paid phones requiring no subscriber information, or fictitious subscriber names, to advance their unlawful activities. These cellular telephones often contain names and phone numbers of other co-conspirators, text messages utilized to further their illicit activities, photographs and videos of gang members, controlled substances, drug proceeds, or firearms. I have observed incarcerated members of gang/criminal enterprises utilize non-gang member's personal identification number when making prison/jail telephone calls to mask their conversations and decrease the likelihood institutional gang investigators will monitor the call. Members of gang/criminal enterprises and DTOs often use the same strategy to mask their ownership of vehicles, real property, and utility services, in an effort to avoid detection by law enforcement.

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

13.     In addition, I am also familiar with the use of text messaging, instant messaging, social media, and other messaging applications, used by gang/criminal enterprises and DTOs to advance their unlawful activities.

14.     I have learned individuals involved in the distribution of controlled substances often conceal evidence of their drug trafficking activities on their person or in their hotel rooms, residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access, such as garages, carports, and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to it and so that they can hide it from law enforcement officers executing search warrants at their residences or businesses. Such evidence includes controlled substances, packaging materials such as baggies, rubber bands, shrink wrap, heat sealers, and drug presses, other drug use and trafficking paraphernalia such as pipes and scales.

15.     It has been my experience members of gang/criminal enterprises and DTOs often maintain records of their transactions in a similar manner to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records often remain for long periods of time, even years, to memorialize past transactions, especially when debts remain open. I have located notes documenting the status of accounts receivable and accounts payable, and the names and phone numbers of suppliers, customers, and co-conspirators, and other associates who have assisted drug traffickers in other ways, such as helping with the cleansing of otherwise "dirty" money. I am aware such proceeds may be made to appear "clean" through a variety of means, including investments into legitimate enterprises and structuring deposits of large amounts of U.S. Currency into financial institutions in such a way so as to avoid the detection by law enforcement, as well as reporting requirements of banking institutions. These records can be maintained on paper,

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

in the form of business and personal ledgers and diaries, calendars, memoranda, pay-owe sheets, drug ledgers, IOUs, miscellaneous notes, money orders, customer lists, and phone address books, in either hard copy or electronic form.

16.     I have learned individuals involved in gang/criminal enterprises and DTOs possess items of identification, including but not limited to, driver's licenses, rent receipts, bills, and address books. These items may be relevant to the identity of those involved in the criminal enterprise, the possessor of the items seized, and occupants of the premises searched.

## BIOMETRIC ACCESS TO DEVICES

17.     Based on my experience, I am aware gang/criminal enterprises and drug traffickers utilize cellular telephones to exchange information, photographs, and felonious communications, to include the names and locations of informants, witnesses, victims. I have also observed gang members discuss the acquisition and distribution of firearms to and from other members, as well as discussions about gang related assaults.

18.     I know from my training and experience investigating criminal gangs and drug trafficking organizations that cellular telephones contain evidence of criminal conduct. More specifically, it has been my experience that cellular telephones are utilized to communicate drug prices, availability, quantity, and the contact information for customers and suppliers. I have also discovered photographs of controlled substances and firearms on cell phones.

19.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

    a.   If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

    b.   If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

    c.   If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the device.

e.  As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g. Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, I request permission to: (1) press or swipe the fingers (including thumbs) of the Target Subjects to the fingerprint scanner of the devices found at the Subject Premises; (2) hold the devices found at the Subject Premises in front of the face of Target Subjects and activate the facial recognition feature; and/or (3) hold the devices found at the Subject Premises in front of the face of Target Subjects and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to request that Target Subjects state or otherwise provide the password or any other means that may be used to unlock or access the devices.

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

Moreover, the proposed warrant does not authorize law enforcement to ask Target Subjects to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## THE TARGET SUBJECT

20.     I have reviewed OLAIZ's criminal history, I am aware that he has been arrested five (5) times and he was convicted of burglary in Arizona and spent more than a year in prison.

## PROBABLE CAUSE

21.     Within the last 48 hours VGTF agents spoke with and an FBI confidential human source (CHS) who advised they knew that OLAIZ was a significant trafficker of methamphetamine and fentanyl "M-30's." Specifically, CHS advised that OLAIZ would be trafficking ten pounds of methamphetamine and 10,000 fentanyl "M-30's" from Phoenix, Arizona to Albuquerque, NM. The CHS has been dealing drugs for more than 40 years and over that time the CHS has supplied various narcotics to Albuquerque street gangs. CHS has provided assistance in three other FBI investigations, which has led to five search warrants, the seizure of three firearms, a considerable amount of methamphetamine and fentanyl "M-30's", and three arrests. CHS is motivated to assist the FBI in hopes to receive consideration in a pending criminal matter. I believe the information provided by CHS to be reliable because much of it has been corroborated by independent investigation. I am unaware of any false or misleading information that CHS has provided. CHS does have a multitude of convictions for conspiracy to distribute cocaine, aggravated battery on a peace officer, trafficking a controlled substance, and possession of a controlled substance. CHS has received no monetary compensation for their cooperation.

22.     In the early morning hours on November 17, 2022, officers from the Yavapai

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

County Sheriff's Office stopped a vehicle registered to OLAIZ, the vehicle was a Ford Fusion with AZ tag RF20626. The traffic stop occurred just a few hours north of Phoenix on Interstate 17 in Camp Verde, AZ. Officers identified the occupants of the vehicle as Ramon RAMIREZ and Sophia SAUCEDA. The occupants advised officers that they were on the way to Albuquerque, NM, they borrowed the car from their cousin, and there was another vehicle traveling with them. Officers subsequently searched the vehicle and located approximately five (5) pounds of methamphetamine and five thousand fentanyl "M-30's" in the vehicle. RAMIREZ later told officers that he met a male on an online chat who told him (RAMIREZ) that he would pay RAMIREZ $500 to transport a package of blues (street term for fentanyl "M-30's") from Phoenix to Albuquerque. RAMIREZ and SAUCEDA were arrested for drug trafficking.

23.     At the time of the November 17, 2022, traffic stop in Camp Verde, AZ agents were utilizing an electronic surveillance technique and observed OLAIZ in the same area as the traffic stop. Further, agents had observed OLAIZ travel north from Phoenix and at the time of the traffic stop they then observed OLAIZ travel back south to Phoenix.

24.     Within the last twelve hours, OLAIZ advised the FBI CHS that he (OLAIZ) was in Albuquerque with ten pounds of methamphetamine and 10,000 fentanyl "M-30's."

25.     At approximately 07:50 am on November 18, 2022, VGTF agents again utilized an electronic surveillance technique and observed OLAIZ in the area of the Subject Premises. Agents then went to the Subject Premises and observed OLAIZ's 2020 GMC Yukon parked in the parking lot. Agents were able to identify room 206, the Subject Premises, as being occupied by OLAIZ.

26.     At approximately 3:10 pm on November 18, 2022, VGTF agents approached the Subject Premises and did not hear running water or toilets flushing. Agents were clearly marked with law enforcement vests. Agents knocked on the door and OLAIZ came to the door and, through

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

the door, asked who was it. Agents responded and OLAIZ left the door, agents then heard the kitchen drawer open and then heard running water and the toilet flushing. After several minutes, no one answered the door and agents believed that OLAIZ was destroying evidence.

27.     Agents subsequently breached the door to the Subject Premises and located OLAIZ, two adult females and a small child. The clothing worn by OLAIZ was wet. Upon securing the residence for officer safety, agents observed a pistol, drug packaging, a kitchen knife suspected to be used to cut open drug packaging, water on the bathroom floor and the bathtub running and full of water. OLAIZ agreed to speak with agents without his attorney present and advised that his DNA would be on the firearm.

## **CONCLUSION**

28.     Based on the information contained herein, I submit probable cause exists to search the Subject Premises, more fully described in Attachment A, for the items described in Attachment B, which are evidence, fruits, and/or instrumentalities of, or property intended for use in committing the target offenses. This affidavit was reviewed by Assistant United States Attorney Paul Mysliwiec.

Respectfully submitted,

Jordan Spaeth
FBI Special Agent

Subscribed electronically and sworn telephonically on November 18, 2022.

HONORABLE LAURA FASHING
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF NEW MEXICO

**ATTACHMENT A**
**Person and Premises to be Searched**

<u>Premises to be Searched:</u> Subject Premises is located at room 206 at the Homewood Suites by Hilton Albuquerque Airport, 1520 Sunport Place Southeast, Albuquerque, New Mexico and a 2020 GMC Yukon, with Arizona tag Z0A04B. Subject Premises may be described as a hotel room with a white door and light colored trim with the number 206 posted on the right side of the door.

The search of the Subject Premises shall include the entire residence. The search shall also include vehicles that has an apparent connection to the Subject Premises. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission or possession of an ignition key.

<u>Biometric Access to Devices:</u> During the execution of the search of the premises described herein, law enforcement officers are also specifically authorized to compel **Gerardo OLAIZ** to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

1. Any devices found at the premises, and

2. Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments

3. for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

4. This warrant does not authorize law enforcement personnel to compel any other individuals found at the premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law

**ATTACHMENT A**
**Person and Premises to be Searched**

enforcement personnel to request that the Subject state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

**ATTACHMENT B**
**Property to be Seized**

The property to be seized includes all evidence, fruits, and instrumentalities of violations of 21

U.S.C. §§ 841(a)(1) and 846 - possession with intent to distribute controlled substances and

conspiracy to distribute controlled substances,  18 U.S.C. §§ 922(g)(1) and 924 - possession of a

firearm and ammunition by a convicted felon; and 18 U.S.C. § 924(c) - possession of a firearm in

furtherance of a drug trafficking crime to include;

1.  Firearms, firearm parts, magazines, and ammunition;

2.  Safes;

3.  Controlled substances, drug packaging materials, and paraphernalia;

4.  Documents, notes, or writings detailing other individuals involved in the distribution of
    controlled substances;

5.  Large amounts of United States Currency;

6.  Cellular telephones;

7.  Video surveillance hard drives or storage devices; and

8.  Articles of property tending to establish the identity of persons in control of premises,
    vehicles, storage areas, and containers being searched, including utility company receipts,
    rent receipts, addressed envelopes, and keys.